[Civ. No. 15077.  First Dist., Div. One.  Mar. 25, 1952.]

Estate of HERMAN PERL, an Incompetent Person.  ROSE PERL SILVERSTEIN, as Guardian etc., Appellant, v. THE DEPARTMENT OF MENTAL HYGIENE, Respondent.

Hone & Lobree and Hubert D. Forsyth for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Palmer, Deputy Attorney General, for Respondent.

WOOD (Fred B.), J.—This is a proceeding brought by the State Department of Mental Hygiene pursuant to the provisions of section 6655 of the Welfare and Institutions Code, for an order allowing the claim of the department against the estate of Herman Perl, an incompetent, for accrued and accruing charges for board, care, maintenance, and medical attention furnished to Herman Perl at Napa State Hospital.

After a hearing, the court ordered the guardian of the estate to pay those charges, at the rates fixed by the department, $60 per month from February 1, 1950, to December

31, 1950, and thereafter at $90 per month or until changed by the department. The guardian has appealed from that order.

It appears that the guardian has since paid the department through April 30, 1951, at the rate of $60 per month, without prejudice to the estate or to the department in a final determination by this appeal or other proceedings of what is the proper and legal charge for the period January 1, 1951, to April 30, 1951, and thereafter.

The sole question is whether or not the Director of Mental Hygiene properly and legally determined and fixed the rate of $90 per month in the exercise of the authority conferred upon him by section 6651 of the Welfare and Institutions Code.

Appellant claims that this statute requires the director to fix the rate at the actual cost of the care, support, and maintenance furnished to the particular inmate, in this case Herman Perl. That was not done. The rate was based upon the per capita cost of all inmates, many of whom required a great deal more care, including medical attention, than did Herman Perl. The significant findings of the court, as summarized by the appellant, were as follows: (1) Herman Perl is chronically insane and suffers from a sort of mental disease not amenable to curative treatment. (2) As a patient at the Napa State Hospital during the period January 1, 1951, to April 30, 1951, Herman Perl received board, lodging and custodial supervision; during said period Herman Perl received no medical care, treatment or attention as a patient in said hospital other than being kept busy in an effort to prevent further mental deterioration. (3) The rate of charge of $90 per month to the estate of Herman Perl was based by the Director of the Department of Mental Hygiene upon the per capita cost of care, support and maintenance of patients at the Napa Hospital, which per capita cost was made up of costs of support of the Napa Hospital, a pro rata portion of the administrative costs of the Department of Mental Hygiene, depreciation of improvements and equipment of said hospital, interest on capital investment in said hospital and a pro rata cost of certain state service agencies, and of employees' retirement costs. (4) Said rate of charge of $90 per month was not based by the director upon the cost of actual care, support and maintenance furnished to said Herman Perl nor upon the reasonable value thereof.

That method of determining the rate was correct. Upon the per capita basis, if all inmates paid in full, the state would be paid the actual cost to it for the care, support, and maintenance of all inmates at the hospital.

The policy of requiring patients "whose friends or whose property can pay their expenses" to "pay according to the terms directed by the Trustees" of the institution, was declared in the Act of May 17, 1853, establishing the Stockton State Hospital. (Stats. 1853, ch. 203, § 17, p. 925.) The special statutes creating other state hospitals contained similar provisions. (For example, "actual charges and expenses," Napa State Hospital, (Stats. 1871-72, p. 673, § 18, p. 678); Mendocino State Hospital, (Stats. 1889, p. 25, § 15, p. 30.)) The provisions of the earlier statutes were consolidated in the Act of March 31, 1897, which imposed "Liability for the care, support, and treatment of the insane" upon the guardian of the estate, if sufficient for the purpose, and upon certain relatives, if of sufficient ability. (Stats. 1897, p. 311, § 6, p. 328.) In 1903, this act was revised and placed in the Political Code, as sections 2136-2199. (Stats. 1903, p. 485.) Sections 2176 and 2180 are of significance in the present inquiry.

Section 2176 declared the relatives, if of sufficient ability, and the estate of the patient, to the extent it is sufficient for the purpose, "liable for the care, support, and maintenance" of the patient, provisions which in 1937 were carried into and are now expressed in section 6650 of the Welfare and Institutions Code.

Section 2180 fixed the rate to be charged, $15 per month "for the care, support, maintenance and clothing of all insane patients at state hospitals for the insane, where there is liability to pay for such care, support, maintenance and clothing . . ." It authorized the medical superintendent of any state hospital to "reduce or remit the amount to be paid by the estate or the relatives . . . on satisfactory proof that said estate or said relatives . . . are unable to pay the said sum of fifteen dollars per month." In 1919, section 2180 was amended to fix the rate at $20 per month (Stats. 1919, p. 272). In 1929, the formula was changed, the rate to be fixed by the director of institutions within a statutory limit of $40, expressed in these terms: "The monthly rate for the care, support, and maintenance of all insane persons at the hospitals for the insane and where there is liability to pay for such care, support and maintenance, shall be the

actual cost thereof as may be determined by the director of institutions, with the approval of the department of finance, but not to exceed forty dollars per month payable in advance . . ." (Stats. 1929, p. 1467.) The provision for reduction or remission upon proof of inability to pay was retained. In 1933, section 2180 was amended by deleting from the formula just quoted the words "the actual cost thereof as may" (Stats. 1933, p. 2305). In this form, without material change, the text of section 2180 became section 6651 of the Welfare and Institutions Code in 1937. It was amended in 1943 to omit the statutory limit of $40 a month. The significant portion now reads: "The monthly rate for the care, support, and maintenance of all insane persons and inebriates at the hospitals for the insane and inebriates where there is liability to pay for such care, support, and maintenance, shall be determined by the Director of Institutions, and shall be payable in advance." (Stats. 1943, p. 2991.) The power to reduce or remit for inability to pay has been retained. The obligation, of course, is not enforcible when there is likelihood of the patient's recovery or release and payment will reduce his estate to such an extent that he is likely to become a burden on the community in the event of his discharge from the hospital. (Welf. & Inst. Code, § 6655; based upon former Pol. Code, § 2181.)

During the period (1903 to 1929) when the monthly rate was fixed by statute ($15 until 1919; thereafter, $20) there could have been no contention that a particular patient could be charged less if he required only custodial care and such care cost the state less than the statutory rate. The statute permitted him to be charged less only if his estate and the responsible relatives were financially unable to pay the $15 or the $20 in full.

The 1929 amendment, giving the director the duty of fixing the rate from time to time, not to exceed $40, did not necessarily change the concept of a uniform rate for all patients able to pay, even though it told the director to fix it at "the actual cost." The state desired to make no profit from the care of its patients if all paid the rate so fixed. In the prudent management of its affairs, it did desire to recoup the cost, up to the $40 limit, if all were able to pay. The major feature of the 1929 amendment was the transfer of the rate-fixing function to the director. He could act promptly, as prices changed and costs fluctuated; the Legislature could

not. Illustrative of such changes is the rise in the per capita cost at Napa State Hospital during recent years: in 1945-46, the per capita cost was $43.32 per month; in 1946-47, $52.95; 1947-48, $68.91; 1948-49, $80.81; 1949-50, $94.75. Whatever inference might have been drawn from the interpolation of the words "actual cost" in the 1929 amendment vanished utterly upon the deletion of those words in 1933. Their deletion did not leave the director without a standard to guide him in fixing the rate. The very obligation of the patient's estate, expressed in terms of liability "for his care, support, and maintenance" (§ 6650), for which the "monthly rate" is the monetary equivalent (§ 6651), denotes cost to the state.

The basing of a rate upon per capita costs is more practical and much less expensive than to keep books on each patient as appellant seeks to require. Few are able to pay in full. Less than half are able to pay in part. According to one witness, ". . . you would have to hire a whole battery of cost accountants and clerks" to do as appellant would require. It would be a strange doctrine that would require the state to keep books upon each of the patients in the several state hospitals (32,100 in March of 1951) in order to ascertain the precise and varying individual costs for the mere 3.7 per cent (1204 in March of 1951) who pay in full or for the additional 42.6 per cent (13,686 in March of 1951) who pay something toward the cost of their keep.

But, says appellant, the Constitution requires the keeping of books on each and every patient because the per capita method of computing costs returns the state a profit on such patients as Herman Perl and operates as a gift to those who require more than average care. That argument would apply with equal force to a statutory rate of charge, but we have not found a record of any such challenge of the statutory rate which obtained during the period of 1903 to 1929. The decision in *Jensen* v. *McCullough* (1928), 94 Cal.App. 382 [271 P. 568], is persuasive of the view that such a challenge would not have been sustained. The court in that case held constitutional the provisions of sections 2192 and 2193 of the Political Code which imposed upon the parent or guardian of a feeble-minded person, having the ability to pay, the duty of paying $20 a month for the support of that person at the home for the feeble-minded and required the county of resident to pay that sum to the state in the first instance. (Some of those provisions now appear in Welf. & Inst. Code, §§ 7009-7011.) A statutory rate of $20

a month was sustained in *State* v. *Grassman* (1937), 157 Ore. 696 [74 P.2d 60]. We think the constitutional principles invoked by appellant herein are inapplicable. The purpose of the statute is to facilitate the prudent, efficient, and economical conduct of the business of the state; not to make a profit on Herman Perl, nor to give something of value to some other patient.

In selecting the per capita method (whether the rate be fixed by statute or by the director) the Legislature doubtless took into consideration the greatly increased cost of collection appellant's method would entail,—cost of collection it would be, not any element of service or care,—which, if allocated and apportioned among the 3.7 per cent who pay in full, or to them and the 42.6 per cent who pay in part, might cause them to pay more than they would pay upon a per capita cost basis. It would be equitable (under appellant's theory, mandatory) to recoup from the paying patients the entire expense of the additional cost accounting and bookkeeping involved.

There is thus presented a situation quite similar to that which furnishes the basis for statutory allowances (by the day, week, month, or year) and fixed mileage rates, in lieu of actual expenses, by way of reimbursement of public officers for costs incurred by them in the performance of official duties. (See *Ware* v. *City of Battle Creek*, 201 Mich. 468 [167 N.W. 891], $40 per month; *State* v. *Reeves*, 44 S.D. 568 [184 N.W. 993], $150 per month; *Milwaukee County* v. *Halsey*, 149 Wis. 82 [136 N.W. 139], $4,000 a year; *Macon County* v. *Williams*, 284 Mo. 447 [224 S.W. 835], $1,200 a year; *Scharrenbroich* v. *Lewis & Clarke County*, 38 Mont. 250 [83 P. 482], 10 cents per mile; *Clark* v. *Board of County Com'rs of Clark County*, 64 S.D. 417 [267 N.W. 138], a fixed rate per mile for the use of the officer's own car; *Taxpayers' League of Carbon County, Wyo.* v. *McPherson*, 49 Wyo. 251 [54 P.2d 897, 106 A.L.R. 767], 15 cents per mile for the use of his car.) In the Scharrenbroich case, the court observed that while on some trips an officer would make money, on others he would lose; and assumed that the Legislature understood that official expenses would average the statutory rate. In the Clark case, the court said the Legislature adopted the fixed rate per mile as a method of computing the amount to be paid instead of requiring the keeping of a precise record of all items of expenditure in detail.

Appellant claims *Estate of Stobie,* 30 Cal.App.2d 525 [86 P.2d 883], supports her theory. We do not so read that decision. The main point under discussion was the appellant's contention that the deletion from section 2180 of the Political Code in 1933 of the words "the actual cost thereof as may be" rendered the statute unconstitutional as an unwarranted delegation of legislative power. The court overruled that contention upon the ground that the very terms of the liability of the estate ("care, support, and maintenance") prescribed the cost thereof as the basis for the monthly rate, hence prescribed a standard to guide the director in fixing the rate. By that holding the court did not expressly or by necessary implication determine that a particular method (the method used by the director in the present case or the method which appellant would have him use) is the only proper method for the fixing of the monthly rate. Indeed, there is some indication that the director in that case used the per capita method. It was stipulated that "the average per capita operating cost of the Stockton hospital for the fiscal year ending June 30, 1935, was $213.78 and that the state's capital investment in that institution was $3,288,-478.15" (p. 530) and the court made the following significant comment: "In the instant case there is no evidence upon which to base the conclusion that the director of institutions acted arbitrarily or discriminatorily in fixing the cost to the state of the care, support and maintenance of the incompetent. The stipulated average per capita cost of the hospital only represented the average cash expense to the state of maintaining each patient during the fiscal year ending June 30, 1935. The state has a large capital investment in the Stockton hospital. The actual cost to the state of maintaining each patient in that hospital should include consideration of this investment. Therefore, as appellant has failed in any satisfactory manner to attack the action of the director of institutions in fixing the cost of the care, support and maintenance of the incompetent at forty dollars per month 'there is no basis for the intervention of this court.' [Citation.]" (P. 531.) It further appears that the appellant therein had stipulated that the director fixed the rate "after an investigation of his [the patient's] requirements in the state hospital." (P. 530.) It does not appear that an issue was drawn, for decision by the reviewing court, as between the per capita cost and the so-called actual cost methods of computing the monthly rate.

Indeed, appellant, in his opening brief therein, said that an examination of the evidence revealed that the "only reference to the cost of care, support and maintenance of inmates . . . reads as follows: 'annual per capita operating cost, $213.78.' . . . Such annual sum amounts to the sum of $17.815 per month and not Forty Dollars per month as found 'fair and reasonable' by the conclusions of law . . . No testimony was offered nor stipulation requested to the effect that any condition existed nor service nor materials furnished which would require any sum in excess of the 'annual per capita operating cost,' to maintain the ward in this case at such institution." (P. 5.) "The fact appears in evidence without conflict, that the annual per capita operating cost to the institution in question, amounts to only $213.78. Such sum must necessarily include every cost of every kind to such institution for the care, support and maintenance of its inmates." (P. 6.) The monthly rate fixed ($40) "is more than double the actual annual per capita cost. . . . That portion of such amount [$480] . . . which is in excess of the actual cost thereof [$213.78] is a special assessment or collection of tax . . ." (Pp. 7, 8.) He was willing to pay $20 a month, and offered to pay at that rate. It is apparent that he accepted the per capita operating cost method of computation as proper, but objected to paying a share (pro rata or otherwise) of the depreciation of the state's three million dollar investment in buildings and equipment, the hospital's fair share of departmental administrative costs, and other similar expenses.

Appellant further contends that the estate is liable for the "reasonable value" of the care, support and maintenance furnished the patient and that the per capita cost thereof to the state does not necessarily represent such reasonable value. In support thereof, he cites *Estate of Yturburru*, 134 Cal. 567 [66 P. 729]. It is true that in that case the court did speak of reasonable value, but the "only point urged by the guardian for a reversal of the order" there involved was to the effect that the law making the guardian responsible for maintenance of his ward was unconstitutional (p. 568). In overruling that contention, the court observed that an insane person is liable for the reasonable value of things furnished to him, necessary for his support, citing section 38 of the Civil Code, and concluded that there was nothing in the Constitution to prevent the Legislature from "requiring that patients at the hospitals for the

insane shall be there supported out of their own estates'' (p. 569). We do not infer from that holding that the court intended to prescribe a particular method for the computation of a monthly rate of charge. Moreover, that decision was rendered prior to the time when the Legislature by statute prescribed a fixed sum as the monthly rate for all patients able to pay. It is not a decision upon the point in issue upon the appeal now before us.

Appellant further criticizes the computation made because, for the period beginning January 1, 1951, the director fixed a monthly rate based upon costs incurred during the fiscal year 1949-50. She does not indicate why she believes the use of those costs was improper. The use of the records for the preceding fiscal year would seem quite appropriate. Upon the closing of the books for a fiscal year, the various elements of cost become known, definite and certain. In contrast, if the director were to compute the monthly rate each month based upon costs during that month, he would have to estimate the probable costs for the remainder of the month, and the added expense of doing so would increase the rate. Also, though costs may fluctuate from year to year, the amount the patient pays will average out over a period of time. Appellant has failed to show why the use of the cost data for the preceding fiscal year is not proper in fixing the monthly rate. The order should be affirmed.

The order appealed from is affirmed.

Peters, P. J., and Bray, J., concurred.